IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

NICHOLAS E. GLUCKSMANN,       )
                              )
            Petitioner,       )      No. 20 C 2946
        v.                    )
                              )      Judge Manish S. Shah
MELINDA EDDY, Warden of the   )
Taylorville Correctional Center, )
                              )
            Respondent.       )

MEMORANDUM OPINION AND ORDER

A judge convicted petitioner Nicholas Glucksmann of aggravated battery of a child and aggravated domestic battery and sentenced him to seven years' imprisonment. Now a prisoner at the Taylorville Correctional Center, Glucksmann seeks habeas corpus relief under 28 U.S.C. § 2254. For the reasons discussed below, the petition is denied.

## I.    Background

### A.    Trial

The state alleged that Glucksmann intentionally caused head trauma to his three-month-old son, E.G., on April 16, 2011. *See People v. Glucksmann*, 2019 WL 2295737, at *1 (Ill. App. Ct. 2019).[1] Its theory was that Glucksmann, frustrated when awakened by E.G.'s crying, violently shook him, causing "bleeding in [E.G.'s] brain, a

---

[1] The facts and procedural history of this case are taken from the state appellate court decision in petitioner's direct appeal, *People v. Glucksmann*, 2019 IL App (2d) 170515-U, 2019 WL 2295737 (Ill. App. Ct. 2019), and are supplemented by the state-court record where needed. *See Hartsfield v. Dorethy*, 949 F.3d 307, 309 n.1 (7th Cir. 2020) ("We take the facts from the Illinois Appellate Court's opinions because they are presumptively correct on habeas review") (citing 28 U.S.C. § 2254(e)(1)).

bruise on his brain, a bruise on his face, swelling on his face, [and] blood in his eyes." (Dkt. 1-6, pg. 172.)[2] Glucksmann stated to several witnesses that, upon E.G. waking up, he put E.G. on the bed while he went to find a baby bottle and tripped on the comforter, causing E.G. to fall several feet onto a hardwood floor. *Glucksmann*, 2019 WL 2295737, at *3. The prosecution called several medical experts who testified that E.G.'s injuries were inconsistent with a fall, but consistent with violent shaking or inflicted impact. *Id.* at *3-7. Glucksmann challenged the experts' conclusions through cross-examination and through one expert witness of his own, who testified that E.G.'s injuries could have been caused by a fall. *Id.* The trial court judge credited the state's witnesses, discredited Glucksmann's witness, and found him guilty of all three counts. *Id.* at *8.

Before trial, Glucksmann moved to bar the state from presenting evidence that E.G. suffered from shaken baby syndrome or abusive head trauma on the basis that neither met the general-acceptance test under *Frye v. United States*, 293 F. 1013 (D.C. 1923).[3] (Dkt. 22-1, pgs. 81-84, 98-113); *Glucksmann*, 2019 WL 2295737, at *1. The trial court held a "pre-*Frye*" evidentiary hearing to consider whether the anticipated expert testimony constituted scientific evidence, for which a *Frye* hearing

---

[2] Page numbers in citations to district court docket entries are taken from the CM/ECF header placed at the top of filings.

[3] Under *Frye*, to admit "expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." *Frye*, 293 F. at 1014; *see also People v. McKown*, 226 Ill.2d 245, 254 (2007) (In Illinois, scientific evidence is admissible at trial only if it meets the standard expressed in *Frye*).

would be warranted, or instead constituted opinion testimony based on the experts' training and experience, to which *Frye* does not apply. (Dkt. 1-10, pgs. 42-143.)

At the pre-*Frye* hearing, Dr. Suzanne Dakil, a child abuse pediatrics expert, testified. (Dkt. 1-10, pgs. 46-133.) She stated that, to determine how a child was injured, she used a differential diagnosis approach, meaning she would "brainstorm" different possibilities explaining an injury and then, based on her training and experience, sort them according to their likelihood. *Id.* at 77-81, 114-23 (quote on pg. 77). A diagnosis of abusive head trauma[4] would mean the injuries were not caused by accident, which she would label as accidental head trauma, but instead, were inflicted on the child by someone. *Id.* at 115-16; *Glucksmann*, 2019 WL 2295737 at *2. The trial court judge questioned Dakil about whether a diagnosis of abusive head trauma, which includes the term "abusive," indicated the intent of the accused. (Dkt. 1-10, pgs. 114-27.) After acknowledging that "abusive" may not be the most accurate term, Dakil reiterated that the diagnosis means that the injury neither was caused by an accident, nor was self-inflicted. *Id.* at 124-33.

At the conclusion of the hearing, the trial court judge determined that a *Frye* hearing was unnecessary because he expected Dakil's testimony to be based on her training and experience, rather than on a novel scientific theory. (Dkt. 1-8, pgs. 57, 169-73.) "I am not gonna allow any doctor to testify that this is a diagnosis of abusive head trauma. I will allow the phrase that this is consistent with abusive head

---

[4] Dr. Dakil explained that the term "abusive head trauma" replaced "shaken baby syndrome" since the victim's injuries could be caused not only from shaking, but also from impact or a combination of shaking and impact. (Dkt. 1-10, pg. 79-80.).

3

trauma." *Id.* at 172-73 (relying on *People v. Cook*, 10 N.E.3d 410, 415-16, 425-26 (Ill. App. Ct. 2014) (no *Frye* hearing on abusive head trauma or shaken baby syndrome was required where experts' opinions on injury causation were based on their medical training and experience, not a test or methodology for diagnosing shaken baby syndrome; testimony that injuries were consistent with shaking was not subject to *Frye*).[5]

At the bench trial, Genevieve Grimes, E.G.'s mother, testified that at about 8:30 p.m. on April 16, 2011, E.G. went to sleep in a bassinet in the master bedroom that Grimes shared with Glucksmann, E.G.'s father. *Glucksmann*, 2019 WL 2295737, at *5. E.G. was three months old. *Id.* Sometime after E.G. fell asleep, Grimes went downstairs. *Id.* Later, she heard E.G. cry very loudly and saw Glucksmann bringing E.G. downstairs, saying E.G. had fallen. *Id.* E.G. looked "purpleish." *Id.* Grimes testified that before E.G. went to sleep, Glucksmann "seemed tired and frustrated" and "was angered easily by little things." *Id.* at *3, 5. Glucksmann was alone with E.G. when the incident occurred. *Id.* at *4, 5.

Glucksmann's account was presented through statements he made to police officers, a Department of Children and Family Services investigator, and a medical social worker. *Id.* at *3, 4. According to his statements, when E.G. awoke in the bassinet, Glucksmann put E.G. on the bed and then went to get a baby bottle. *Id.* Glucksmann tripped on the comforter, causing E.G. to fall approximately two-and-

---

[5] The trial court also stated that it would give the jury a limiting instruction to caution the jury from blindly accepting any expert's opinion. (Dkt. 1-8, pg. 173.) Ultimately, the case proceeded by bench trial.

one-half feet off the bed onto a hardwood floor face first. *Id.* A police witness who measured the height from the floor to the top of the bedspread testified the height was 22 to 23 inches. (Dkt. 1-4, pg. 137.) According to Glucksmann, E.G. was pale, his eyes were rolling back, and the left side of his face was swollen. Glucksmann thought E.G. had passed out. *Glucksmann*, 2019 WL 2295737, at *3, 4. Glucksmann said he shook E.G. "in an up-and-down motion." *Id.* at *4. Grimes and Glucksmann took E.G. to Provena Mercy Hospital in Aurora, Illinois. *Id.* at *3, 5.

The Provena emergency room physician testified that E.G. had a "raised and tense" bulge on the top of his head, indicating swelling and pressure around the brain; blood in the back of both eyeballs; dried blood in his nostrils; and bruising above and below the left eye. *Id.* A CT scan performed that night showed several areas of fresh and older bleeding around E.G.'s brain. *Id.* E.G. was airlifted to Lutheran General Hospital to be treated by specialists because the Provena physician "believed E.G.'s situation was life threatening." *Id.* at *3, 5. The doctor said he had treated over one thousand children with a history of a fall and had never seen an infant come in with retinal hemorrhages and multiple intracranial hemorrhages in different healing states from a fall.[6] *Id.* at *3; *see also* (Dkt. 1-4, pgs. 262-63.) A second CT scan was taken of E.G.'s head the following day at Lutheran Hospital. (Dkt. 1-6, pg. 124.)

Two radiologists, Drs. Bernard Schupbach and Bradley Strimling, testified about the CT scans. *Glucksmann*, 2019 WL 2295737, at *4, 8. Dr. Schupbach made

---

[6] Petitioner's counsel notes that "hemorrhage" is often used as a verb, while "hematoma" is a noun. (Dkt. 1, pg. 5 n.1.) Hemorrhage is not exclusively a verb, and can be used as a noun. *See* https://www.merriam-webster.com/dictionary/hemorrhage (visited Dec. 16, 2022).

5

the following findings: "[1] an acute epidural hematoma over the left frontal region; [2] an acute parietal subdural hematoma on the left side; [3] a chronic subdural hematoma over the left temporal region, with a superimposed acute hemorrhage; [4] some evidence of a contusion in the anterior right temporal lobe; and [5] an acute hemorrhage over the left tentorium at the back of the brain." *Glucksmann*, 2019 WL 2295737, *4. He explained that an acute hemorrhage is between one and seven days old, while a chronic hemorrhage is at least 21 to 30 days old. (Dkt. 1-4, pgs. 307-14, 322-26.) Concerning the chronic hematoma with a superimposed acute bleed, he explained that an old hemorrhage could rebleed as a new hemorrhage. *Id.* at 322-23. "At the time he interpreted the CT scan, he did not have E.G.'s history of injury." *Glucksmann*, 2019 WL 2295737, *4. But "[t]he multiple areas of intracranial hemorrhage raised his concern of intentional trauma or nonaccidental head injury." *Id.*

Dr. Strimling reviewed the CT scans from April 16 and 17, 2011. (Dkt. 1-6, pg. 124.) Strimling's reading of the April 17th scan, similar to Schupbach's reading of the April 16th scan, indicated E.G. had a "chronic [hemorrhage] on the left with superimposed acute blood and multicompartmental new blood on the right." *Id.* at 164. "The new blood" on the right side, stated Strimling, "represents a contusion." *Id.* at 160. "His review raised concerns that E.G.'s trauma was nonaccidental. In particular, the new bleeding on the right side of the brain could not be explained by a re-bleed on the left side of the brain." *Glucksmann*, 2019 WL 2295737, *8; *see also*

6

(Dkt. 1-6, pg. 140.) Both radiologists denied E.G.'s bleeds were caused by thrombosis, a blood-clotting disorder. (Dkt. 1-6, pg. 159-60; Dkt. 1-4, pg. 321.)

The attending pediatric emergency physician at Lutheran supervised the examination of E.G. on April 17, 2011, including review of his medical records from the transferring hospital. *Glucksmann*, 2019 WL 2295737, *5. She testified that she had seen a lot of children that rolled off a bed but had not seen E.G.'s type of head trauma or head bleeds absent some underlying medical problem or a fall from an upper bunk bed. *Id.*; *see also* (Dkt. 1-5, pgs. 48-59.)

E.G.'s pediatrician concurred with the other medical treaters. In her practice she had seen children who had fallen off beds and changing tables, but none of them presented with retinal hemorrhages or intracranial hemorrhages. *Glucksmann*, 2019 WL 2295737, *5. She stated that E.G. had no retinal or intracranial hemorrhages when she first saw him, two weeks after he was born. *Id.* She added that she had no concern that E.G. had any genetic condition, metabolic abnormality, clotting disorder, autoimmune condition, or nutritional deficiency. *Id.* When she examined E.G. in March and May of 2011, before and after the incident, he was developmentally normal. *Id.*; *see also* (Dkt. 1-5, pgs. 7-43.)

Dr. Dakil, who testified at the pretrial hearing about abusive head trauma and shaken baby syndrome, also testified at trial. Based on her training and experience—which included having treated at least one thousand children (Dkt. 1-5, pgs. 174-85)—she ruled out both accident, such as a fall from a bed, and preexisting medical conditions as causes of E.G.'s injuries. She opined instead that E.G.'s injuries were

caused by violent shaking and impact.[7] *Glucksmann*, 2019 WL 2295737, *6-7; *see also* (Dkt. 1-5, pgs. 191-02, 223-34; Dkt. 1-10, pgs. 115-16.) She explained: "Children often have short falls and we don't see this type of injury. Small impacts can lead to skull fractures, small subdural hemorrhages underneath a fracture, unilateral hemorrhage, maybe. We don't see bilateral hemorrhage. We don't see fleshy bruising on the face and bilateral retinal hemorrhages in children in short falls." (Dkt. 1-5, pgs. 201-02); *see also Glucksmann*, 2019 WL 2295737, *6. Dakil acknowledged that a short fall could cause an old hemorrhage to rebleed, but explained that the only old hemorrhage was on the left side of E.G.'s brain, meaning that the new bleeds on the right side could not have been caused by minor trauma. (Dkt. 1-5, pgs. 214, 226-27.)

Dakil acknowledged that E.G.'s birth involved complications—he was delivered by vacuum extraction (use of a suction cup on his head to pull him through the birth canal), and his mother had used Methadone during pregnancy—but Dakil ruled out those circumstances, as well as any genetic or nutritional disorders, abnormal blood conditions, or other diseases. *Id.* at 223-34. Nor could E.G.'s injuries, according to Dakil, have been caused by Glucksmann "gently" shaking E.G. to revive him, as Glucksmann had reported to doctors. Instead, "violent shaking" was required. *Id.* at 191-92. She concluded that E.G.'s injuries were "consistent with abusive head trauma and child physical abuse." *Id.* at 191.

---

[7] There was evidence that about three weeks before the April 16, 2011 incident, Glucksmann elbowed E.G. in the head while taking a nap next to E.G., who "whined" a bit, but did not cry. *Glucksmann*, 2019 WL 2295737, at *4. Dakil testified: "it's doubtful that [the elbowing] would have caused any injury at all." (Dkt. 1-5, pg. 203.)

A pediatric specialist who examined E.G. on April 17, 2011, echoed Dakil's opinion that E.G.'s brain hemorrhages could not be explained by a fall triggering a new bleed from an old bleed, but instead were consistent with violent shaking. *Glucksmann*, 2019 WL 2295737, at *5-6; (Dkt. 1-5, pgs. 61-75.) He added that, based on his experience and his reading of medical literature, most retinal hemorrhages in babies were caused by violent shaking, thus causing increased "interval pressure and pressure on the vessels in the back of the optic nerve." *Glucksmann*, 2019 WL 2295737, at *5-6; (Dkt. 1-5, pg. 73, 75). Such injuries, he said raised a concern about abusive head trauma. *Id.* at *5; (Dkt. 1-5, pg. 67).

Two ophthalmologists testified at trial. A pediatric ophthalmologist who examined E.G. on April 17, 2011, testified that E.G. had hemorrhages in both retinas. "In her opinion, E.G.'s retinal hemorrhages were unlikely to have been caused by a fall." *Glucksmann*, 2019 WL 2295737, *6; *see also* (Dkt. 1-5, pg. 168) (at trial, she described the hemorrhages as "fairly d[if]use," and stated: "I would say it would be unlikely to have that extensive of hemorrhages from falling off a bed."). A retina specialist examined E.G. on April 22, 2011. (Dkt. 1-5, pg. 140-41.) He also saw hemorrhages in both of E.G.'s retinas, and he believed the "hemorrhages were consistent with [shaken baby syndrome]." *Glucksmann*, 2019 WL 2295737, *6; *see also* (Dkt. 1-5, pgs. 143, 150.)

The defense called one witness, Dr. Shaku Teas, a pathologist who reviewed E.G.'s CT scans, as well as medical, police, and DCFS reports. *Id.* She also consulted with two radiologists, Drs. Julie Mack and Patrick Barnes. *Id.* at *7, 9. According to

9

Teas, a fall from a short distance could have caused E.G.'s hemorrhages and face injuries, and she disagreed that the CT scans showed a brain contusion. *Id.* at *7. She also characterized E.G.'s injuries as "minor transient injuries." (Dkt. 1-6, pg. 64.) Teas noted that E.G. had no neck injury, *id.* at 13, or fractures, and that his cervical spine assessment was normal. *Glucksmann*, 2019 WL 2295737, at *7. She also said that E.G. had chronic hemorrhages on both sides of his brain. (Dkt. 1-6, pgs. 9, 36.)

Teas testified that retinal hemorrhages are caused by increased intracranial pressure, but she had no opinion on why E.G.'s intracranial pressure increased; nor did she think retinal hemorrhages were meaningful for drawing conclusions about mechanisms of injury. *Glucksmann*, 2019 WL 2295737, at *7. Teas acknowledged the existence of theories that shaking can cause retinal hemorrhages, but she claimed such theories were not proven. *Id.*; *see also* (Dkt. 1-6, pgs. 16, 74-75, 81-82.)

She suggested that E.G.'s chronic brain hemorrhages could have been caused by E.G.'s delivery by vacuum extraction. (Dkt. 1-6, pgs. 6, 62-63.) She also testified that vitamin deficiencies can cause bleeding (Dkt. 1-6, pg. 12), and opined that thrombosis (a blood clotting disorder) could explain E.G.'s acute bleeding—although she had "no idea" if E.G. had such a disorder. (Dkt. 1-6, pgs. 12, 13, 36, 47, 81).

The trial court judge, citing the testimony of the state's experts (Dkt. 1-6, pg. 235), found that "E.G. suffered three acute areas of subdural hematoma with one of these acute areas superimposed on a chronic area of subdural hematoma. These were three separate and distinct areas of acute subdural hematoma. I also find E.G. suffered from retinal hemorrhaging . . . I find E.G. suffered great bodily harm." *Id.* at

10

238. Glucksmann was the only person present when the injuries took place. *Id.* at 240.

The trial judge further found, after considering all the experts' testimony and Glucksmann's statements to doctors and investigators, including a lengthy recorded statement, *id.* at 239-40, that: "The defendant's version of E.G.'s fall off the bed was not consistent with the injuries. . . . I find the defendant did create a situation which subjected E.G. to injury, trauma to the head." *Id.* at 235-43, 250-52 (quote from pg. 241). The judge added: "I draw no conclusions from the experts' opinions that the injuries were consistent with shaken baby syndrome or abusive head trauma," but instead considered "the circumstantial evidence of all the injuries." *Id.* at 236. The court did not accept expert testimony to the extent it suggested that "certain types of diagnoses automatically is proof of a certain type of mental state or knowledge" or "that certain types of injuries which are consistent with the diagnosis of shaken baby syndrome or abusive head trauma … gives rise to a conclusion intent of the defendant." *Id.* at 242-43.

The judge also found that Glucksmann's statements that he gently shook E.G. to revive him "not credible and an attempt to mislead or minimize and put an innocent explanation on the incident." *Id.* at 250. Instead, the judge found that Glucksmann "did shake E.G. at the time of the incident" and "knowingly caused great bodily harm to E.G. and created a situation which subjected E.G. to head trauma." *Id.* at 250. The "nature and extent of the injuries is indicative of trauma intentionally caused." *Id.* at 250. The judge found Glucksmann guilty of all counts. *Id.* at 251-52.

11

### B.    Post-Trial

With new counsel, Glucksmann moved for reconsideration of the guilty verdict, or for a new trial, claiming: insufficiency of the evidence; improper testimony from the state's witnesses that E.G. was abused; and ineffective assistance of trial counsel. *Glucksmann*, 2019 WL 2295737, at *8. The trial court held an evidentiary hearing at which Drs. Teas and Mack (one of the radiologists with whom Teas consulted for trial) testified; the other radiologist with whom Teas consulted, Dr. Barnes, submitted a written report—the same report he had provided Teas before trial. *Id.* at *8-9. Teas's testimony was consistent with her trial testimony. *Id.* at *9. Mack echoed Teas's opinion that E.G.'s injuries could be explained by rebleeding of chronic (older) bleeds that occurred during birth; that rebleeding could have occurred with a minor trauma, such as a fall; and that E.G.'s short-lived injuries were inconsistent with shaking. *Id.* Barnes's report opined, consistent with Teas's testimony, that E.G.'s brain hemorrhages represented thromboses and strokes, and that he saw nothing on the CT scans to indicate nonaccidental injury. *Id.*

The trial court judge denied Glucksmann's motion, concluding again that the state's evidence at trial was more credible than the evidence Glucksmann presented at the hearing and that the hearing evidence largely duplicated Teas's trial testimony. *Id.* at *10.

### C.    Direct Appeal

On direct appeal, Glucksmann argued: (1) the trial evidence was insufficient to support his convictions because (a) E.G.'s bleeding had stopped by the time his

second CT scan was taken eight hours after the incident and he thus sustained no great bodily harm, and (b) several state expert witnesses relied on radiologist Dr. Schupbach's flawed conclusions that E.G. had a brain contusion and a preexisting, chronic bleed *only* on the left side; (2) the trial court erred by not conducting a *Frye* hearing; and (3) his trial attorney was ineffective (a) for failing to call a radiologist, such as Drs. Mack or Barnes, to testify at trial, and (b) for not calling expert witnesses to discredit the theories of abusive head trauma and shaken baby syndrome. (Dkt. 22-5, pgs. 1-55.)

The Illinois appellate court affirmed, concluding that the evidence was sufficient to prove Glucksmann's intentional acts caused great bodily harm to E.G., that no *Frye* hearing was necessary, and that Glucksmann could establish neither the deficient performance nor the prejudice prong of his ineffective assistance claims. *Glucksmann*, 2019 WL 2295737, at *11-15. Glucksmann unsuccessfully sought a rehearing, (Dkt. 22-8; Dkt. 22-9, pg. 4), and his petition for leave to appeal to the Illinois Supreme Court was denied. (Dkt. 22-9); *People v. Glucksmann*, 135 N.E.3d 555 (Ill. 2019). He then filed his federal habeas petition.[8]

## II.    Analysis

Glucksmann's § 2254 petition argues: (1) the trial evidence was insufficient to support his convictions; (2) his due process right to a fair trial was violated because he was convicted based on the controversial and discredited theories of shaken baby

---

[8] This case was assigned to the undersigned judge in September 2022.

syndrome and abusive head trauma; and (3) his trial attorney was ineffective. (Dkt. 1, pgs. 23-42.)

### A. Standard of Review and Procedural Default

With respect to claims adjudicated on the merits by a state court, federal habeas corpus relief is unavailable unless that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

An unreasonable application of federal law under § 2254(d)(1) means "more than incorrect; it must have been objectively unreasonable." *Felton v. Bartow*, 926 F.3d 451, 464 (7th Cir. 2019) (citing *Williams v. Taylor*, 529 U.S. 362, 409-11 (2000)). It "means something . . . lying well outside the boundaries of permissible differences of opinion." *McGhee v. Dittmann*, 794 F.3d 761, 769 (7th Cir. 2015) (citations omitted); *see also Harrington v. Richter*, 562 U.S. 86, 103 (2011) ("a state prisoner must show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement").

Under § 2254(d)(2), a state court decision involves an unreasonable determination of the facts if it "rests upon fact-finding that ignores the clear and convincing weight of the evidence." *Gage v. Richardson*, 978 F.3d 522, 528 (7th Cir.

2020) (citation omitted). A federal court cannot "conduct its own independent inquiry and reweigh factors as a *de novo* matter," *Sanders v. Radtke*, 48 F.4th 502, 510-11 (7th Cir. 2022) (quoted case omitted), and a federal court "may not characterize . . . state-court factual determinations as unreasonable 'merely because [it] would have reached a different conclusion in the first instance'" *Brumfield v. Cain*, 576 U.S. 305, 313-14 (2015) (citation omitted).

If § 2254(d)'s deferential standard appears "difficult to meet, that is because it was meant to be. […] [H]abeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington*, 562 U.S. at 102-03; *see also Minnick v. Winkleski*, 15 F.4th 460, 468 (7th Cir. 2021). Glucksmann bears the burden of showing that the state court's decision was unreasonable. *Harrington*, 562 U.S. at 99.

With respect to claims Glucksmann did not fully and fairly present to the state courts, such claims are procedurally defaulted. State prisoners must exhaust state-court remedies before bringing their claims to federal court. *See* § 2254(b); *O'Sullivan v. Boerckel*, 526 U.S. 838, 844 (1999). If a state prisoner did not fully and fairly present his federal claim to the state courts, federal habeas review is available for these claims only if he establishes either: (1) cause for the default and actual prejudice; or (2) a resulting fundamental miscarriage of justice if his federal claim is not reviewed, e.g., that new, reliable evidence demonstrates he is actually innocent. *See Blackmon v. Williams*, 823 F.3d 1088, 1099 (7th Cir. 2016) (citations omitted).

### B. Sufficiency of the Evidence

Glucksmann makes two arguments that the evidence was insufficient to prove his guilt. First, he argues the evidence showed that E.G. had a chronic (older) hemorrhage on both the left and the right sides of his brain, such that his acute (newer) hemorrhages on both sides could be explained as rebleeds caused by a fall. (Dkt. 1, pgs. 24-28.) Second, he contends the state courts relied on the discredited theories of shaken baby syndrome and abusive head trauma to find that he intentionally caused E.G.'s injuries. *Id.* at 28-33.

The Illinois Appellate Court stated the correct legal standard for such a claim: "'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trial of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Glucksmann*, 2019 WL 2295737, *11 (emphasis in original) (quoting *People v. Bishop*, 843 N.E.2d 365, 375 (Ill. 2006) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

Glucksmann does not challenge state-court findings with respect to several elements of his aggravated-battery-of-a-child conviction,[9] such as Glucksmann's and

---

[9] Glucksmann was convicted of three counts: aggravated battery of a child causing great bodily harm (count 1); aggravated battery of a child causing bodily harm (count 2), and aggravated domestic battery (count 3). Because "[c]ounts two and three merged into count one," the state appellate court focused on the sufficiency of the evidence of count one. *Glucksmann*, 2019 WL 2295737, at *10; *see also* (Dkt. 22-4, pg. 9-10) (in its judgment of conviction, the trial court also merged counts 2 and 3 into count 1); *People v. Betance-Lopez*, 38 N.E.3d 36, 50 (Ill. App. Ct. 2015) ("The effect of a trial court merging one conviction into another conviction is vacatur of the merged conviction.").

16

E.G.'s ages at the time of the incident or whether E.G. suffered great bodily harm.[10]
Instead, Glucksmann argues the Illinois courts unreasonably determined that his
intentional acts caused E.G.'s injuries based on: (1) misunderstandings of the
radiologists' interpretations of E.G.'s CT scans, and (2) the discredited theories of
shaken baby syndrome and abusive head trauma.

### 1. *Chronic Bleed on the Right Side of E.G.'s Head*

Glucksmann states the Illinois Appellate Court, Dr. Dakil, and the trial court
misinterpreted evidence from the radiologists, mainly Dr. Strimling. (Dkt. 1, pgs. 24-
25.) "The radiologists," states Glucksmann, "unanimously agreed that E.G. had
chronic or old bleeding *on both the left and the right sides* of his head." *Id.* at 26
(emphasis in Glucksmann's brief). Glucksmann contends that a correct reading of the
radiologists' testimony supports his position at trial—that E.G. had older bleeds
before the April 16, 2011 incident and that an accidental fall from a bed onto a

---

[10] Under Illinois law, the offense of aggravated battery of a child is committed when "[a]ny person of the age 18 years and upwards . . . intentionally or knowingly, and without legal justification and by any means, causes great bodily harm . . . to any child under the age of 13 years." 720 ILCS 5/12-4.3(a) (2008). Although Petitioner's appellate brief and PLA on direct appeal challenged whether E.G. suffered "great bodily harm," (Dkt. 22-5, pg. 47-48), his § 2254 petition does not repeat this claim. His petition twice refers to E.G.'s injuries as "transient," (Dkt. 1, pgs. 24, 28), but "underdeveloped, conclusory" allegations in a petition do not sufficiently assert a claim. *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012) (citing cases); *see also* Rule 2(c) of the Rules Governing § 2254 Cases. Furthermore, whether transient injuries—in this case acute bleeding in/around an infant's brain and retinas— qualify as "great bodily harm" under Illinois law is really an issue of state law not cognizable in federal habeas review. *See Crockett v. Butler*, 807 F.3d 160, 168 (7th Cir. 2015). Glucksmann's characterization of E.G.'s injuries as minimal or temporary is just part of his factual argument that they were more consistent with a fall from a bed, rather than from violent shaking. (Dkt. 1, pgs. 24-33.)

hardwood floor caused the old bleeds to rebleed, thus causing intracranial pressure, which resulted in retinal hemorrhaging. *Id.* at 24-25. According to Glucksmann:

> The key question was whether there was chronic bleeding on the right side of E.G.'s brain. If there was, then all experts agree that the short fall from the bed could have caused the acute or new bleeding on the right side as well as on the left. The radiologists Strimling and Mack both affirmatively testified that there was old or chronic bleeding on both sides of E.G.'s brain. No radiologist testified that there was chronic bleeding only on the left. Thus, Dr. Dakil's opinion, which the Illinois Court relied upon to uphold the conviction, was unsupported. And the Illinois Appellate Court upheld Glucksmann's conviction based upon evidence that does not exist in the record.

(Dkt. 23, pg. 6.)

Because the state appellate court decided the merits of Glucksmann's sufficiency-of-the-evidence claim, he must demonstrate that its decision "was contrary to, or involved an unreasonable application of, clearly established" federal law as determined by the Supreme Court, or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence." § 2254(d)(1)-(2).

The Illinois Appellate Court stated the correct legal standard for reviewing a sufficiency-of-the-evidence claim and, contrary to Glucksmann's contention, reasonably applied the standard. Strimling said "yes" in response to a question that asked if there was new and old blood on the left and right sides of E.G. brain. But he also said there was new blood on the right side, with some subdural blood, (Dkt. 1-6, pg. 160), and described the left hemisphere as having new blood "superimposed upon old subdural blood." (Dkt. 1-6, pg. 161.) A finder of fact could reasonably understand Strimling's testimony to mean that the right side was different than the left, with a

18

contusion on the right side and acute high-density blood unexplained by thrombosis. With the testimony of at least six other medical experts who opined that E.G.'s injuries were not caused by a fall, and other parts of Dakil's testimony ruling out an accident based on evidence other than the CT scans, there was evidence from which the trial court could reasonably find an injury that was not caused by an accidental fall as described by Glucksmann in his statements. That leaves sufficient grounds to infer intentional infliction of injury.

*Jackson*'s sufficiency-of-the-evidence "deferential standard does not permit the type of fine-grained factual parsing" that Glucksmann suggests for Strimling's testimony, particularly not with the added deference afforded the state appellate court's decision under § 2254(d). *Coleman v. Johnson*, 566 U.S. 650, 655 (2012); *see also Cavazos v. Smith*, 565 U.S. 1, 7-8 (2011).

The state appellate court's determination of the intentional and knowing element of Glucksmann's offense was based on the following:

> Next, the evidence was also sufficient to prove defendant's mental state. The State's ophthalmologist witnesses […] were both accepted as experts and both personally examined E.G. [One ophthalmologist] never testified to abusive head trauma or shaken baby syndrome, only that in her opinion, a short fall was unlikely to cause retinal hemorrhages. [The other] testified that, based on his examination, E.G.'s retinal hemorrhages were 'consistent with' shaken baby syndrome. He also testified that retinoschisis and retinal folds were rarely caused by trauma. Teas agreed that increased intracranial pressure could cause retinal hemorrhages, but she disagreed that retinal hemorrhages were diagnostic of abuse. Contrary to [the second ophthalmologist's] testimony, she believed retinoschisis and retinal folds would have been more diagnostic of abuse. The [trial] court resolved this conflict in the evidence in the State's favor, finding [the State's witness] more credible than [the defense's].

*Glucksmann*, 2019 WL 2295737, *12. This description of the evidence has support in the record. *See* (Dkt. 1-5, pg. 168); *see also id.* at 143 (retina specialist's opinion based on his examination of E.G.'s retinas (and not CT scans, which is the focus of Glucksmann's § 2254 argument above)).

The state appellate court further stated:

> Beyond the testimony from the ophthalmologists, the court heard additional circumstantial evidence of defendant's intent. Dakil testified that E.G.'s bruise was unlikely to have been caused by a fall but more likely to have been caused by a sharp impact force.

*Glucksmann*, 2019 WL 2295737, *12. This too is supported by the record. *See* (Dkt. 1-5, pg. 192-93, 202-03).

Continuing, the state appellate court noted that other doctors, "both pediatricians, testified that they had treated many children who fell off beds, and absent some underlying issue, those children did not present with intracranial bleeding or retinal hemorrhages." *Glucksmann*, 2019 WL 2295737, *12; *see also* (Dkt. 1-5, pgs. 50-59); (Dkt. 1-5, pg. 23).

After its discussion of the testimony from several of the state's witnesses, the Illinois Appellate Court concluded:

> Accordingly, there was sufficient evidence for a rational trier of fact to convict defendant. The trial court weighed the State's medical testimony against Teas's testimony, and it found the State witnesses more credible. We are mindful that we do not retry a defendant on appeal ([*People v.*] *Kant*, 2016 IL App (2d) 140340, ¶ 18 [(Ill. App. Ct. 2016)], and under these facts, we cannot say that the trial court's findings were unreasonable.

*Glucksmann*, 2019 WL 2295737, *12. The state appellate court clearly understood the sufficiency-of-the-evidence standard and applied it reasonably. As that court

observed, with support in the record, there was evidence—apart from Glucksmann's analysis of Strimling's testimony about E.G.'s CT scans—that E.G.'s injuries were inconsistent with a fall. The possibility that E.G.'s right-side bleed was caused by minor trauma does not make unreasonable the determination that the other evidence recounted by both the state trial and appellate courts (the retinal hemorrhages and the multiple pediatricians and ophthalmologists who personally examined E.G. and opined that his injuries were nonaccidental based on their training and experience) directly supported the conviction.

Strimling testified that his initial impression after viewing the April 16, 2011 scan "was concern[ ] at that time for nonaccidental trauma given the spectrum of abnormal findings on [E.G.'s] CT brain. This was further confirmed on a subsequent study on the 17th." (Dkt. 1-6, pg. 147.) Dr. Schupbach, the other radiologist who testified at trial, similarly stated that, after viewing the April 16, 2011 CT scan, he was concerned that E.G. had sustained an "intentional trauma or nonaccidental head injury." (Dkt. 1-4, pg. 312.) Neither radiologist who testified at trial supported Glucksmann's theory that E.G.'s injuries were caused by an accidental fall from a bed. So even if some part of Strimling's testimony supported Glucksmann's old-bleed theory, other parts emphasized Strimling's bottom-line opinion that E.G.'s injury was nonaccidental. A fact finder could reasonably credit that portion of his testimony. Furthermore, "even if '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial

court's . . . determination.'" *Wood v. Allen*, 558 U.S. 290, 301 (2010) (quoting *Rice v. Collins*, 546 U.S. 333, 341 (2006)).

For all the reasons stated above, Glucksmann cannot clear the high hurdle set by § 2254(d) and, thus, no federal habeas relief is available for this claim.

2.   *References to Shaken Baby Syndrome and Abusive Head Trauma*

Glucksmann argues that evidence of the discredited theories of shaken baby syndrome and abusive head trauma improperly influenced the guilty verdict. (Dkt. 1, pgs. 28-33.)

Before trial, the judge addressed whether expert witnesses could testify that they diagnosed shaken baby syndrome or abusive head trauma. *See Glucksmann*, 2019 WL 2295737, *1. After an evidentiary hearing to address if a *Frye* hearing was needed to determine if the diagnoses were "generally accepted" scientific principles in the medical field, the trial court ruled: "I am not gonna allow any doctor to testify that this is a diagnosis of abusive head trauma. I will allow the phrase that this is consistent with abusive head trauma." (Dkt. 1- 172-73) (relying on *People v. Cook*, 10 N.E.3d 410, 415-16, 425-26 (Ill. App. Ct. 2014). Accordingly, the judge barred any testimony that E.G. was diagnosed with shaken baby syndrome or abusive head

22

trauma but allowed testimony that E.G.'s injuries were "consistent with" them. (Dkt. 1-8, pgs. 163-73.)[11]

At trial, no expert witness testified he or she diagnosed shaken baby syndrome or abusive head trauma or that E.G.'s injuries were necessarily the result of shaken baby syndrome or abusive head trauma. Rather, the state's witnesses, based on their training and experience, opined that E.G.'s injuries were inconsistent with a fall, but were consistent with shaking and impact. Three witnesses described E.G.'s injuries as being "consistent" with abusive head trauma or shaken baby syndrome. (Dkt. 1-5, pgs. 68, 72-73, 143,191.) But the trial judge expressly rejected those references. (Dkt. 1-6, pgs. 236, 242, 250-51.) "I draw no conclusions from the experts' opinions that the injuries were consistent with shaken baby syndrome or abusive head trauma. . . . I do listen to all the experts on their opinions as to the injuries . . . [and] how these injuries could be caused." *Id.* at 236. "I am not comfortable with relying on the

---

[11] The trial judge's ruling reflected two concerns. One was the application of *Frye* to the proffered testimony. There, the court's citation to and discussion of *Cook*, demonstrated its application of Illinois law to the admissibility of expert testimony under *Frye*. The second concern was about the implication that a diagnosis of shaken baby syndrome or abusive head trauma was direct evidence of Glucksmann's intent. *See* Dkt. 1-8, pg. 171-173 ("I still feel that brings into play intent […] but I think I can cure at least most of those problems with the limiting instruction."). Separate from the *Frye* inquiry, Illinois law directs trial courts to exercise caution when admitting expert testimony about a criminal defendant's mental state or the actual circumstances under which apparently nonaccidental injuries occurred. *See People v. Willett*, 37 N.E.3d 469, 487-489 (Ill. App. Ct. 2015). Allowing an expert to testify that injuries were consistent with nonaccidental injury simply tracks state-law evidentiary principles. *See id.* at 488 (trial court did not abuse its discretion by allowing experts to describe injuries as consistent with nonaccidental trauma). The trial judge's statements about the scope of expert testimony were in line with how Illinois courts resolve both *Frye* issues and the admissibility of evidence of intent.

experts/doctors' opinions that certain types of injuries . . . are consistent with the diagnosis of shaken baby syndrome or abusive head trauma." *Id.* at 242.

The judge was, however, "comfortable with taking the conclusions and opinions of experts and doctors concerning the nature of the injuries and how they are caused and then coming to my own conclusions concerning the mental state of the defendant." *Id.* at 243. When issuing his verdict, the trial court judge found that "defendant did shake E.G. at the time of the incident," "[t]he defendant's version is not consistent with the physical injuries observed, and . . . is not credible," and the trial judge drew that "conclusion not from the diagnosis of the expert[s], but from the injuries caused, actually the totality of the circumstances of the evidence presented in this case." *Id.* at 257-58.

 Glucksmann's contention that the trial court relied on shaken baby syndrome and abusive head trauma when making its findings is belied by the record. Instead, the Illinois courts relied on the expert witnesses' opinions that E.G.'s injuries were inconsistent with a fall (as Glucksmann contended in his statements) and were more consistent with being shaken. (Dkt. 1-6, pg. 250); *see also Glucksmann*, 2019 WL 2295737, *3-8. Glucksmann does not argue, nor can he, that physicians cannot distinguish accidental from inflicted injuries, or opine on the possible causes of injuries.

And the verdict was not based entirely on opinions about abusive head trauma. The trial judge relied on: Glucksmann's statement that he shook E.G.; the court's credibility assessment that Glucksmann's version of shaking minimized his conduct;

the evidence that Glucksmann was alone with E.G.; the corroborative impact of multiple experts opining that the injuries were nonaccidental; and its assessment of the weight of the prosecution's expert testimony compared to the defense's. (Dkt. 1-6, pg. 233-251.) None of these findings depended on any reliance on the theory of shaken baby syndrome.

Furthermore, even if the state courts relied on shaken baby syndrome or abusive head trauma to conclude that Glucksmann caused E.G.'s injuries, that would not warrant federal habeas relief under § 2254(d). Some authorities have questioned the validity of shaken baby syndrome. (Dkt. 1, pgs. 28-33; Dkt. 1-3; Dkt. 23, pg. 11); *see also Cavazos v. Smith*, 565 U.S. 1, 13-14 (2011) (Ginsburg, J., dissenting). But the United States Supreme Court has never ruled that admission of testimony about these theories is unconstitutional or so unreliable to be a factual basis for habeas relief. The only decision on the subject from the Supreme Court reinstated a jury verdict in a child-homicide case that rested on shaken baby syndrome evidence. *Cavazos*, 565 U.S. at 2-9. Thus, even if the Illinois courts had relied on the syndrome, such reliance would not be "contrary to, or involve[] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." § 2254(d)(1); *see also Wright v. Van Patten*, 552 U.S. 120, 126 (2008).

Glucksmann's challenges to the sufficiency of the evidence warrant no federal habeas relief.

### C.    Due Process Right to a Fair Trial

Glucksmann also argues that "[a] conviction based upon flawed and discredited science violates Due Process." (Dkt. 1, pg. 32.) Similar to his sufficiency-of-the-evidence challenge, Glucksmann contends that "recent scientific tests have . . . shown that the whiplash forces required to cause bleeding around a child's brain would also be expected to cause neck and spine injuries and/or broken ribs. Yet, E.G. sustained no injuries other than the internal hemorrhages." *Id.* at 40. "A conviction based on flawed and discredited science," repeats Glucksmann, "violates a defendant's right to Due Process under the Fifth and Fourteenth Amendments . . . by denying him a fundamentally fair trial." *Id.*

Glucksmann acknowledges he did not raise a due process challenge to the medical evidence in state court. *See id.* at 40-41 and n.17 ("He did not specifically raise a Due Process challenge to the State's medical evidence."); *see also Glucksmann*, 2019 WL 2295737, *12-13 (the state appellate court addressed whether the trial court should have conducted a *Frye* hearing under Illinois law, but not whether the failure to do so violated due process).

The failure to present a federal claim in one full round of state-court review results in a procedural default. *See* § 2254(b); *Boerckel*, 526 U.S. at 844-45. Glucksmann had to assert his claim "in concrete, practical terms, [so that] the state court [was] sufficiently alerted to the federal constitutional nature of the issue." *Ward v. Jenkins*, 613 F.3d 692, 696 (7th Cir. 2010) (quoting *Ellsworth v. Levenhagen*, 248 F.3d 634, 639 (7th Cir. 2001). Glucksmann did not do this. (Dkt. 22-5, pgs. 48-52; Dkt.

22-9, pgs. 11-19.) His failure to specifically present his due process claim with respect to the absence of a *Frye* hearing or to the references to shaken baby syndrome and abusive head trauma at trial resulted in a procedural default. *See Ward*, 613 F.3d at 696; *see also Mitchell v. Lashbrook*, No. 12 CV 9603, 2018 WL 1586245, at *6 (N.D. Ill. Mar. 31, 2018) (the failure to argue a due process violation when challenging the absence of a *Frye* hearing in state court did not fairly present the due process claim, which was considered defaulted).

Glucksmann argues his default should be excused because he is actually innocent. (Dkt. 1, pg. 41); *Coleman*, 501 U.S. at 750; *Hicks v. Hepp*, 871 F.3d 513, 531 (7th Cir. 2017). He "must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found [Glucksmann] guilty beyond a reasonable doubt.'" *House v. Bell*, 547 U.S. 518, 536-37 (2006) (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). This standard usually requires "'new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.'" *House*, 547 U.S. at 537 (quoting *Schlup*, 513 U.S. at 324); *see also Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005) ("evidence . . . [sufficient] to meet the actual innocence bar . . . is 'documentary, biological (DNA) or other powerful evidence: perhaps some non-relative who placed him out of the city, with credit card slips, photographs, and phone logs to back up the claim.'")

Glucksmann presents no new evidence. Instead, he repeats his discussion of the trial evidence and relies on a 2019 law review article generally challenging the

diagnosis of shaken baby syndrome. (Dkt. 1, pg. 40-42; Dkt. 1-2.) This is not the type of showing sufficient to establish actual innocence. *House*, 547 U.S. at 537; *Schlup*, 513 U.S. at 324; *Hayes*, 403 F.3d at 938. Discrediting shaken baby syndrome through more recent scientific studies would not have made it likely that no fact finder would convict. Such evidence would not change the admissible opinion evidence that E.G.'s injuries were nonaccidental, Glucksmann's admission that he shook E.G., or the evidence that he was the sole cause of E.G.'s injuries.

Furthermore, even if Glucksmann could satisfy the actual-innocence exception, the Illinois courts did not rely on shaken baby syndrome or abusive head trauma to determine that E.G.'s injuries were intentionally inflicted. No doctor at trial testified that E.G.'s injuries were intentionally caused based on a diagnosis of shaken baby syndrome or abusive head trauma. Although three expert witnesses stated that E.G.'s injuries were consistent with shaken baby syndrome, (Dkt. 1-5, pgs. 68, 72-73, 143, 191), the state trial court put those statements aside. (Dkt. 1-6, pg. 236); *id.* at 242; *id.* at 243. The references to shaken baby syndrome or abusive head trauma by some of the expert witnesses did not "so infect[] the ju[dge]'s deliberation that they denied [Glucksmann] a fundamentally fair trial." *United States v. Brown*, 822 F.3d 966, 975 (7th Cir. 2016) (explaining the standard for a violation of the due process right to a fair trial) (citing *United States v. Avila*, 557 F.3d 809, 822 (7th Cir. 2009) ("We must use care not to magnify the importance of errors that had little significance in the trial setting."). The trial court credited the prosecution's experts' opinion only as far as they opined that the injuries were consistent with nonaccidental causes; the court

then weighed that against the evidence of accidental causes (Glucksmann's various statements and Teas's testimony), and arrived at a conclusion beyond a reasonable doubt. There was no due process error.

### D. Ineffective Assistance of Counsel

Glucksmann claims his trial counsel was constitutionally ineffective in two ways: (1) failing to consult with a radiologist to better equip counsel to cross-examine Dr. Dakil about her conclusion that E.G.'s only chronic hemorrhage was on the left side of his brain; and (2) failing to interview and call expert witnesses to challenge the theories of shaken baby syndrome and abusive head trauma purportedly relied on by the prosecution. (Dkt. 1, pgs. 33-39.) Neither claim is availing.

Under *Strickland v. Washington*, 466 U.S. 668, 104 (1984), Glucksmann must show both (1) counsel's performance "fell below an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688, 694. Failure to prove either prong is fatal to the claim. *Id.* at 697; *Winfield v. Dorethy*, 956 F.3d 442, 452 (7th Cir. 2020). Glucksmann procedurally defaulted the first claim and cannot show that the state appellate court unreasonably applied *Strickland* in rejecting the second.

#### 1. Failure to Consult with a Radiologist

Glucksmann argues that trial counsel should have consulted with a radiologist, such as Dr. Mack, to enable counsel to cross-examine Dakil more effectively about the location of E.G.'s old and new bleeding. (Dkt. 1, pgs. 33-36.)

29

Glucksmann claims that consulting a radiologist would have helped counsel suggest E.G. had chronic hemorrhages on both sides of his brain, bolstering Glucksmann's theory that E.G.'s new bleeding was rebleeding of chronic hemorrhages, consistent with a fall. (Dkt. 1, pgs. 33-36.)

On direct appeal, Glucksmann argued that trial counsel was ineffective for failing to call Drs. Mack or Barnes to testify in order to rebut the State's evidence that E.G. suffered a brain contusion and to clarify that E.G.'s intracranial bleeding was not within the brain, but instead, only around it. (Dkt. 22-5, pgs. 51-53.); *see also Glucksmann*, 2019 WL 2295737, at *14. Glucksmann's § 2254 claim is different as it involves counsel's failure to properly prepare her cross-examination of Dakil concerning the location of old and new hemorrhages. *See Rittenhouse v. Battles*, 263 F.3d 689, 695 (7th Cir. 2001) (adequate presentation of a claim through one complete round of state-court review requires petitioner to "present both the operative facts and the legal principles that control each claim to the state judiciary"). Because Glucksmann did not fairly present to the state court the operative facts of the claim he now raises, he procedurally defaulted it. *Stevens v. McBride*, 489 F.3d 883, 894 (7th Cir. 2007) (raising a related, yet different, claim in state court did not fairly present the § 2254 claim).

Glucksmann repeats his contention that any default should be excused because he is actually innocent. (Dkt. 23, pg. 12 n.2.) But as explained above, he does not make the requisite showing of actual innocence to excuse his default.

But even if this court could review this claim, it fails on the merits. First, Glucksmann points to no evidence, such as an affidavit, showing that trial counsel failed to consult a radiologist before trial or demonstrating how trial counsel would have cross-examined Dakil differently had counsel consulted radiologists. *See Pole v. Randolph*, 570 F.3d 922, 946 (7th Cir. 2009) (refusing to assume trial counsel failed to investigate potential defense witnesses where defendant failed to substantiate his claim with evidentiary support); *see also Doxy v. United States*, No. 08 CV 283, 2009 WL 1748013, at *8 (N.D. Ind. June 18, 2009) ("Speculation does not suffice to make a showing of ineffective assistance," and a litigant must provide "some explanation [about] the cross-examination that should have been conducted.") (citations omitted).

Second, more vigorous cross-examination of Dakil, aided by counsel's consultation with a radiologist such as Mack, would not have raised a "reasonable probability" that "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The trial court judge, after hearing Dr. Mack testify, still found "the defendant's rendition of what happened to not be credible. I found it then and I find it today after having viewed all . . . the materials that were presented to the Court," which included Dr. Barnes' report. (Dkt. 1-9, pg. 50.) Yet Glucksmann contends that, had his trial counsel consulted Mack or Barnes, neither of whom the trial court credited over the state's experts, counsel's cross-examination of the state's witnesses would have been not simply more effective, but would have persuaded the trial judge to believe Glucksmann's version of the events. But the judge still did not believe the defense radiology theories after hearing from the radiologists.

31

2. *Failure to Call Experts to Challenge Shaken Baby Syndrome*

Glucksmann claims that trial counsel was ineffective for failing to present testimony from scientific experts to challenge the theories of shaken baby syndrome and abusive head trauma, and that the Illinois Appellate Court's rejection of this claim was an unreasonable application of *Strickland*. (Dkt. 1, pgs. 36-39.) The state appellate court resolved this ineffectiveness claim as follows:

> [T]rial counsel's decision not to present evidence against theories of shaken baby syndrome and abusive head trauma was neither unreasonable nor prejudicial. Such evidence was unlikely to be helpful because, as we explained [earlier], the State did not rely on a theory of shaken baby syndrome or abusive head trauma. Rather, the State relied on its physicians' opinions that E.G.'s injuries were not caused by a short fall from the bed, and their opinions were based on their training and experience. Defense counsel reasonably focused on offering alternative explanations for E.G.'s injuries and disputing the State's conclusions, but the [trial] court found the State's witnesses to be more credible.

*Glucksmann*, 2019 WL 2295737, at *15.

That analysis reasonably applied *Strickland*. First, trial counsel vigorously challenged the admissibility of shaken baby syndrome and abusive head trauma evidence before trial and succeeded in persuading the trial court to bar testimony that E.G. was diagnosed with either. *See Glucksmann*, 2019 WL 2295737, *1-2. Second, as explained above, the state did not rely on the theory of shaken baby syndrome to prove its case, and the trial judge, though he allowed testimony that E.G.'s injuries were "consistent with" shaken baby syndrome and abusive head trauma, ultimately gave no weight to that characterization. The basis of Glucksmann's conviction was the testimony that E.G.'s injuries were inflicted rather than accidental, that they were inconsistent with a fall and, instead, indicated violent

32

shaking and impact. Shaken baby syndrome or abusive head trauma did not provide a necessary inferential step toward conviction. Presenting expert witnesses to testify against those theories would not have created a "reasonable probability" that "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Glucksmann's claim therefore fails.

### E. Evidentiary Hearing

Glucksmann requests an evidentiary hearing "to present witnesses and evidence to further support [his] claims." (Dkt. 1, pgs. 1, 43 (quote on pg. 43); Dkt. 23, pg. 17.) Before a federal court conducts an evidentiary hearing in a § 2254 case, the requirements of 28 U.S.C. § 2254(e)(2) must be met. Under that section, "[i]f [a petitioner] has failed to develop the factual basis of a claim in State court proceedings," he must satisfy the higher standards of § 2254(e)(2)(A) and (B), which require not only a showing that the evidence could not have been previously discovered, but also that the new facts "would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." § 2254(e)(2)(B). Glucksmann says a hearing would allow him to introduce scientific evidence to discredit the theories of shaken baby syndrome and abusive head trauma and clear up any ambiguities in Dr. Strimling's testimony. But he does not specify how either subjects could not have been previously discovered or how a hearing would result in the requisite clear and convincing showing. He does not grapple with § 2254(e)(2)(A) and (B). *See also Shinn v. Ramirez*, 142 S. Ct. 1718, 1734 (2022) (adding that a federal

habeas court is not required to take any evidence, and the decision to permit new evidence must be informed by principles of comity and finality). Given this court's determination that the state courts did not act unreasonably and that Glucksmann's proffered subject areas of inquiry would not have affected the outcome of the trial, an evidentiary hearing is unnecessary.

## III. Conclusion

Glucksmann's habeas corpus petition, (Dkt. 1), is denied. The court declines to issue a certificate of appealability.[12] The Clerk shall: (1) terminate Respondent Clarke from the docket, (2) add Melinda Eddy, Warden, Taylorville Correctional Center, as Respondent, (3) alter the case caption to *Glucksmann v. Eddy*, and (4) enter judgment and terminate civil case.

ENTER:

Manish S. Shah
United States District Judge

Date: 12/19/2022

---

[12] Glucksmann had a viable trial strategy, but the verdict was based on a fact finder's reasonable weighing of admissible evidence, and the state courts evaluated the legal issues within the bounds of settled principles. Glucksmann has not made a substantial showing of the denial of a constitutional right, or that reasonable jurists would debate, much less disagree with, this court's resolution of Glucksmann's claims, including its procedural rulings. *Arredondo v. Huibregtse*, 542 F.3d 1155, 1165 (7th Cir. 2008) (*citing* 28 U.S.C. § 2253(c)(2)); *see also Slack v. McDaniel*, 529 U.S. 473, 484 (2000).